IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| YUNITA ISOM, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 08-205-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| LEGACY GOOD SAMARITAN | ) | |
| HOSPITAL AND MEDICAL CENTER, | ) | |
| an Oregon Corporation; and BETTY | ) | |
| HOYT, individually, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

Edward J. Hill
1826 NE Broadway
Portland, Oregon 97232-1430

Donald B. Potter
621 SW Morrison Street, Suite 140
Portland, Oregon 97205-3804

Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Robert Lane Carey
Blerina Kotori
Tonkon Torp LLP
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon  97204

    Attorneys for Defendants

KING, Judge:

Plaintiff Yunita Isom, an African-American woman, was employed at defendant Legacy Good Samaritan Hospital and Medical Center ("Legacy") until her termination in 2005.  Legacy states that it terminated Isom for taking excessive breaks and lunches, but Isom alleges that she was subjected to higher scrutiny and harsher discipline because of her race.  She alleges claims for race discrimination under ORS Chapter 659A, 42 U.S.C. § 1981, and Title VII and a claim for the intentional infliction of emotional distress.  Before the court is Defendants' Motion for Summary Judgment (#16).  For the reasons below, I dismiss the claim for the intentional infliction of emotional distress.  The various statutory race discrimination claims will proceed to trial.

## PRELIMINARY MATTERS

Defendants move to strike four types of evidence filed by Isom to support her response to the summary judgment motion.  Defendants also move to strike other parts of the record because of authentication problems.  I address some of the arguments below but decline to rule on objections based on relevancy.  If I conclude a fact is relevant to my analysis, I will include it in this opinion.  I also do not rule on the Notice of Substantial Evidence Determination and witness interviews because I am able to rule in Isom's favor without considering these documents.

Page 2 - OPINION AND ORDER

I.      Isom's Declaration

Defendants move to strike paragraph seven of Isom's declaration because they contend that it contradicts her deposition testimony.  In her deposition, Isom was asked if she remembered signing off the board at 7:45 PM and not clocking off work until 7:55 PM on December 20.  Isom stated that she had no memory of what happened at the end of the shift but stated that she did not believe it was true.  When asked why, Isom stated:

> A.  I just don't.  It doesn't make any sense.  It doesn't make any sense for me to sit there at the board ten minutes or 15 minutes before it's time for me to get off work and clock out, sit there and wait ten minutes and then clock out and leave.  It doesn't make any sense.

Supplemental Carey Decl. Ex. 4 at 105-06.  In paragraph seven of her declaration, Isom stated that it sometimes took several minutes after signing off the switchboard to do work-related tasks like put away materials, deal with pagers and beepers, brief incoming operators, and walk through the building to exit.

Affidavits which are inconsistent with prior deposition testimony given by the affiant should be stricken if the court makes a factual determination that the contradictory matter is actually a "sham" and not the result of an honest discrepancy, a mistake, or the result of newly discovered evidence.  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991).

Isom's declaration statement does not contradict her deposition statement.  Instead, it fills in the reasons that Isom apparently forgot when she stated that it made no sense.  Therefore, I deny the motion to strike this paragraph.

II.    Deposition Excerpt Problems

Defendants note that Isom failed to file some of the Hoyt and Roach deposition excerpts which she cites in her brief.  Defendants also move to strike all deposition excerpts filed by Isom. They note that the excerpts are not properly authenticated and the lines relied upon are not highlighted, as required by Local Rule 56.1(c)(3).

Isom refiled the deposition excerpts.  At oral argument, defendants agreed that the refiling cured the errors.  I deny the motion to strike the excerpts.

## FACTS

Legacy has an Employee Conduct Policy that demands regular attendance for 97 percent of scheduled work hours, requires employees to start and return from breaks and meal periods on time, and prohibits combining meal and break periods.  Legacy also has a Time and Attendance Policy which requires employees to clock in and out promptly at the beginning and end of each workday and prescribes rules on breaks and meals.  The Legacy Personnel Guidelines also prohibit the combination of meals and breaks.

Isom was employed at Legacy from March 8, 1999 until December 28, 2005 as a switchboard operator in the telecommunications department ("Telecom") of Legacy's Good Samaritan Hospital, which relays incoming, outgoing, and interoffice calls.  If an operator is not at the switchboard as scheduled, there is a significant impact on business operations and Telecom team members.

Legacy uses a computer audit program that tracks the time a switchboard operator is signed on and off the board.  An African-American co-worker of Isom, Eddarine Roach, generated audit reports from the computer program and provided them to the supervisor.  Roach

Page 4 - OPINION AND ORDER

states that there were difficulties with the audit reports from late November 2005 until December 18, 2005. No audit reports were run during that period. All problems were fixed by December 19, 2005. Roach has observed Isom taking excessively long breaks and lunch periods. She states that the audit reports she ran for December 19 and 20, which are discussed below, confirm her observations.

Roach also brought an action against Legacy for race discrimination based on co-workers and volunteers being disrespectful to her and Hoyt failing to look into the situation. The case was settled.

During her tenure at Legacy, Isom had three supervisors, including Joan Wild and then Betty Hoyt, who was trained by Wild. Isom had no problems with Wild because of Isom's race. Hoyt, who is white, is the only manager whom Isom thinks discriminated against her because of her race. Both Wild and Hoyt disciplined Isom for deviations from Legacy policies.

On September 9, 2004, Wild gave Isom her first written corrective action for being rude to a co-worker. Isom denies making some of the statements attributed to her.

On May 12, 2005, Wild sent Isom an attendance memo to inform her that her attendance for the quarter was 89 percent compared to Legacy's acceptable attendance standard of 97 percent.

On September 13, 2005, Wild emailed Isom to ask her to adhere to the policy on clocking in and out. The email stated that employees cannot clock in or out of work more than seven minutes before or after their scheduled time.

On September 21, 2005, Wild gave Isom a second written corrective action for: (1) being signed off the switchboard for 60 minute lunch breaks on September 13, 14, and 15 when she is

allowed a 30 minute lunch break; (2) visiting with the housekeeper who works in the Telecom area; and (3) clocking in more than seven minutes before the scheduled start time on September 5 and 11. The action warned Isom that failure to improve performance would result in further corrective action, including termination, and that Isom must abide by the Time and Attendance Policy. Hoyt attended this meeting as part of her training to assume Wild's duties.

Hoyt conducted Isom's annual review for the period ending September 30, 2005. Isom agrees that the review was positive, with her attendance being the only problem discussed.

Hoyt observed Isom continue to take excessively long lunch periods. Isom's co-workers, including Marianne Moore, also reported Isom's long lunches to Hoyt.

On November 21, 2005, Hoyt, who was now supervising Isom, issued a final corrective action. The memo states that Isom was signed off the board for periods longer than permitted by her meal or break times on October 12, 13, 23, and 27. It also states that Isom was still visiting with the housekeeper several times during each shift, even though the housekeeper was only to enter the Telecom area to complete her duties.

Roach brought Hoyt the audit reports for December 19 and 20, 2005. Hoyt said, "I got her. I got her. She [referring to Isom] doesn't know who she was messing ["fucking"] with." Roach Depo. at 75, 100, 118.

On December 28, 2005, Legacy terminated Isom after the audit reports indicated that she was off the board for unauthorized periods of time on December 19 and 20 and clocked off work ten minutes after signing off the switchboard on December 20.

Isom has a different version of the events underlying her disciplines and termination. She disputes the accuracy of the audit reports. For example, she does not think that she was signed

off the switchboard for an hour-long lunch on September 13, 14, and 15, as shown in the audit and relied upon by Legacy in the second written corrective action issued on September 21, 2005. Roach told Isom that the audit reports had been incorrect during a several month period, including during September, and that service was contacted to correct the problem.  Isom never spoke to Roach, however, about the reports for December 19 or 20 on which Legacy based the termination.

Roach also told Hoyt each time Roach believed that a report was inaccurate.  Roach testified that the audit report run for October 13, prior to Isom's shift, had inaccuracies.  Roach confirmed that she was unable to run the audit reports between November 21 through December 18.  Hoyt acknowledges that there were days during which the computer could not track the calls to create accurate audit reports.  Hoyt states that the system was functioning on the days for which Isom was disciplined.

Isom states that it can take several minutes between signing off the switchboard and clocking out to take care of work-related tasks such as putting away materials, pagers, and beepers; briefing the incoming operator; and walking through the building to the exit.

Isom believes Legacy treated her Time and Attendance Policy violations differently than it treated similar violations by some of her co-workers.  Isom maintains that she saw co-workers Marianne Moore (who is white), Linda Johnson (white), Roach (African-American), Velma Jones (African-American), Pat (white), and Faye Lawson (African-American) either taking long breaks and lunches or combining their breaks and lunch into a longer period.  She claims that this happened on a daily basis.  Isom is unaware if the co-workers were disciplined for rule violations.  She believes, however, that if the co-workers had been disciplined or warned, she

would know about it because that type of information was known to everybody in the office when it happened.  Roach was unaware, however, that Isom received a final corrective action on November 21, 2005.  Roach also believed that Johnson, Moore, and a third white co-worker, Liz Shaw, were off the board much more than Isom.

Legacy did not issue any documentation of corrective action to Johnson or Shaw concerning the audit reports and time off the board.  Hoyt had a disciplinary discussion with Moore for taking extra breaks in December 2005.  On July 20, 2005, Moore was given a final corrective action for absence and tardiness in excess of the amount allowed by Legacy's policies. On September 27, 2005, Moore received her annual performance review.  The review noted that Moore had improved her attendance in August and September 2005 and was otherwise generally positive.  On July 19, 2006, Moore received a documented verbal corrective action for absence and attendance problems in April through June 2006.  Moore was terminated on October 31, 2006 for being insensitive to racial comments in a fairy tale book which she brought to work.

Isom disputes defendants' characterization of her socializing in the Telecom area.  Isom claims that the housekeeper would come into the Telecom area to do her job, not just to speak to Isom.  According to Isom, the housekeeper let herself through the locked door by punching in her personal access code.  Isom stopped speaking to the housekeeper completely after Wild first spoke to her about it.

Isom saw people who were not hospital employees come into the Telecom area with Moore and Johnson.  Two or three times a week, Johnson would bring her husband, sister, or daughter into Telecom.  Moore had a companion spend the night with her during the graveyard

Page 8 - OPINION AND ORDER

shift.  Isom witnessed Moore bring a dog and a chicken into the area.  Isom does not know if

anybody reported the animals to management but thinks that Hoyt saw the chicken.

Isom reports that a new white co-worker, Liz Shaw, spoke to Hoyt about an issue she was

having with Roach, who is African-American.  Shaw reported to Isom that Hoyt told her "that's

their culture" and "that's the way they act."  Isom Dep. at 190.  Isom thinks Hoyt was referring to

African-Americans but Isom did not know the entire context of the conversation.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party.  Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    Race Discrimination

Defendants seek summary judgment against Isom's claims for race discrimination under

Title VII, ORS Ch. 659A, and 42 U.S.C. § 1981.

A.    Applicable Legal Standards for the Different Statutory Claims

      1.      <u>Title VII</u>

It is rare to see a discrimination case with direct evidence of discrimination. "The Supreme Court's landmark case regarding employment discrimination claims brought under Title VII, <u>McDonnell Douglas v. Green</u>, [411 U.S. 792, 802-04, 93 S. Ct. 1817 (1973),] sets forth a proof framework with two distinct components: (1) how a plaintiff may establish a prima facie case of discrimination absent direct evidence, and (2) a burden-shifting regime once the prima facie case has been established." <u>Noyes v. Kelly Services</u>, 488 F.3d 1163, 1168 (9th Cir. 2007).

      2.      <u>Section 1981</u>

42 U.S.C. § 1981 prohibits intentional discrimination based upon race in the making and enforcement of contracts, including employment contracts. To prevail under this statute, a plaintiff must prove that the defendant acted with intent to discriminate. <u>Swinton v. Potomac Corp.</u>, 270 F.3d 794, 806 (9th Cir. 2001), <u>cert. denied</u>, 535 U.S. 1018 (2002); <u>Mustafa v. Clark County School District</u>, 157 F.3d 1169, 1180 (9th Cir. 1998). An employment discrimination claim under § 1981 follows the same analysis as in a Title VII disparate treatment case. <u>Fonseca v. Sysco Food Services of Arizona, Inc.</u>, 374 F.3d 840, 850 (9th Cir. 2004).

      3.      <u>Oregon Discrimination Statute</u>

The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law. <u>Henderson v. Jantzen, Inc.</u>, 79 Or. App. 654, 657, 719 P.2d 1322. The Ninth Circuit has held that when analyzing Oregon's disability discrimination statute, it would apply the *McDonnell Douglas* burden-shifting analysis rather than Oregon's rule because the burden-shifting analysis is federal procedural law. <u>Snead v. Metro. Prop. Cas. Ins. Co.</u>, 237 F.3d 1080, 1090-93 (9th Cir.), <u>cert. denied</u>, 534 U.S. 888 (2001).

Isom argues that in opposing a motion for summary judgment on a state discrimination claim, a plaintiff's burden is so "minimal as to be virtually impervious to a motion based on evidentiary sufficiency." Lansford v. Georgetown Manner, 192 Or. App. 261, 277, 84 P.3d 1105 (internal quotation omitted), modified on other grounds, 193 Or. App. 59, 88 P.3d 305 (2004). Relying on Pascoe v. Mentor Graphics Corp., 199 F. Supp. 2d 1034, 1052 n.4 (D. Or. 2001), Isom argues that Snead only applies to cases in federal court on the basis of diversity jurisdiction. Because defendants removed this action based on federal question jurisdiction, Isom contends that Snead does not apply.

I disagree with Isom. The Snead court based its holding on the *Erie* doctrine using an analysis of the Supreme Court's outcome determination test, the federal interests of court efficiency, and the distribution of trial functions between judge and jury. Snead, 237 F.3d at 1090-92. I see no way in which the analysis would be changed by the fact that Isom's case was removed based on federal question jurisdiction rather than diversity jurisdiction. In either instance, her claims would be resolved in federal court. Accordingly, I will apply the *McDonnell Douglas* burden-shifting analysis.

B.    Prima Facie Case

Defendants argue that Isom cannot establish two elements of her prima facie case: (1) that she was performing her job according to Legacy's legitimate expectations; and (2) other similarly-situated employees were treated more favorably.

To prove a Title VII disparate treatment claim, a plaintiff must establish a prima facie case of discrimination. A prima facie case may be demonstrated by direct evidence of discriminatory intent or may be based on a presumption arising from factors set forth in

<u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Noyes v. Kelly Services</u>, 488 F.3d 1163, 1168 (9th Cir. 2007).  Generally stated, the factors are:  (1) membership in a protected class; (2) qualification for the job or satisfactory performance of the job; (3) an adverse employment decision; and (4) different treatment than those similarly situated outside of the protected class.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  At summary judgment, the degree of proof necessary to establish a prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." <u>Lyons v. England</u>, 307 F.3d 1092, 1112 (9th Cir. 2002) (internal quotation omitted).

Concerning Isom's job performance, defendants rely on Isom's three corrective actions prior to her termination.  They note that two of the corrective actions were initiated by Wild, who Isom admits was not racially motivated against her.

Isom claims that she was more than qualified for her job, relying on her annual review given a month before her termination in which she was called "a GREAT operator."  Hoyt Decl. Ex. 11 at 2.  Isom argues that the corrective actions on September 21 and November 21 are instances of discriminatory adverse actions which render defendants' argument circular.

In light of the generally good review that Isom received shortly before her termination, she has met the minimal burden to establish that she was satisfactorily performing her job.

Defendants contend that Isom does not know whether her comparators were disciplined or not.  Defendants also note that three of the comparators were African-American, like Isom, and other comparators engaged in misconduct different in nature from Isom's.

Isom argues that some white operators allowed friends into the Telecom area in violation of company policy without being issued any written discipline.  Isom also contends that in the December 2005 audit, some white operators were signed off the switchboard as much or more

than she was alleged to have been signed off but the white operators were not issued any written

discipline for doing so.

There is evidence that white operators had guests in the Telecom area and no evidence

that they were disciplined. Moreover, Legacy admitted that it did not issue any documentation of

corrective action to Johnson or Shaw concerning the audit reports and time off the board. Isom

and Roach both testified that these employees were off the board as much or more than Isom.

Isom has met the burden to establish that she was treated differently than similarly-situated white

operators.

C.     Nondiscriminatory Reason

> If established, the prima facie case creates a rebuttable presumption that
> the employer unlawfully discriminated against the plaintiff. Id. The burden of
> production then shifts to the employer to articulate a legitimate, nondiscriminatory
> reason for its action. Id. If the employer meets this burden, the presumption of
> unlawful discrimination "simply drops out of the picture." St. Mary's Honor Ctr.
> v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The
> plaintiff then must produce sufficient evidence to raise a genuine issue of material
> fact as to whether the employer's proffered nondiscriminatory reason is merely a
> pretext for discrimination. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282
> (9th Cir. 2000).

Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1037 (9th Cir. 2005).

Defendants state that they disciplined and terminated Isom for failing to follow the Time

and Attendance Policy. Isom concedes that this is a legitimate nondiscriminatory reason for

termination but argues the reason is a pretext for race discrimination.

D.     Pretext for Discrimination

"When evidence to refute the defendant's legitimate explanation is totally lacking,

summary judgment is appropriate even though plaintiff may have established a minimal *prima*

*facie* case based on a *McDonnell Douglas* type presumption." <u>Wallis v. J.R. Simplot Co.</u>, 26

F.3d 885, 890-91 (9th Cir. 1994). Plaintiff is not required, however to produce additional,

independent evidence of discrimination at the pretext stage if the prima facie case raises a

genuine issue of material fact regarding the truth of the employer's proffered reasons. <u>Chuang v.</u>

<u>University of California Davis</u>, 225 F.3d 1115, 1127 (9th Cir. 2000). "[A] plaintiff can prove

pretext in two ways: (1) *indirectly*, by showing that the employer's proffered explanation is

unworthy of credence because it is internally inconsistent or otherwise not believable, or (2)

*directly*, by showing that unlawful discrimination more likely motivated the employer." <u>Noyes</u>,

488 F.3d at 1170 (internal citation and quotation omitted). "[I]n the context of summary

judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial

evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence."

<u>Cornwell v. Electra Central Credit Union</u>, 439 F.3d 1018, 1030 (9th Cir. 2006) (noting tension

with the <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217 (9th Cir. 1998), line of cases and their

standard requiring specific and substantial circumstantial evidence of pretext).

      The parties raise numerous arguments which I will not address here because I conclude

that Isom raised a factual issue that the reasons for her discipline and termination are a pretext for

race discrimination.

      Isom claims that she was disciplined for alleged conduct for which defendants failed to

discipline white co-workers as severely, if at all. Isom contends that white co-workers brought

friends into the Telecom area who had no business reason to be there but the co-workers were not

disciplined. Defendants claim that the impact on its operations is less problematic if an

employee brings a friend to the Telecom area because those people are not on Legacy's payroll.

Page 14 - OPINION AND ORDER

In contrast, when Isom brought a housekeeper into the Telecom area to talk, both of them were not performing their jobs.

There is evidence that Johnson and Moore, white co-workers of Isom, brought friends, family, and animals into the Telecom area and that Hoyt was aware of some of the visits. Additionally, if visits happened two or three times a week, I will infer that management was aware of them. I am unpersuaded by defendants' argument that it is worse if two employees are chatting than if an employee is chatting with an outsider. In both cases, an operator is not performing her assigned tasks. Moreover, visitors in the Telecom area could overhear conversations about patients which should be kept confidential, such as whether someone is a patient in the hospital.

Isom also maintains that the computer records show that three white co-workers had large amounts of time off the switchboard but were not given any written discipline. Roach corroborates these facts.

Defendants claim that the other employees to which Isom refers did not have prior discipline related to phone call activity, followed by additional poor audit reports. Further, Isom admitted that she did not know if the instances were reported to management. Defendants also note that three of these co-workers are African-American.

Roach gave audit reports about various employees to Hoyt so there is an inference that Hoyt would have known about some of the worst offenders besides Isom. Legacy admitted that it did not issue any documentation of corrective action to Johnson or Shaw concerning the audit reports and time off the board. Defendants' argument concerning prior discipline followed by

Page 15 - OPINION AND ORDER

additional poor audit reports does not explain why Legacy did not discipline these white co-workers in the first instance.

I conclude that Isom raised a factual issue that the reasons for her discipline and termination are a pretext for race discrimination. Accordingly, I deny defendants' motion for summary judgment against the race discrimination claims alleged under Title VII, § 1981, and the Oregon state discrimination statute.

II.    Intentional Infliction of Emotional Distress

Defendants move for summary judgment against Isom's claim for intentional infliction of emotional distress.

The tort of intentional infliction of emotional distress contains the following elements:

> (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

McGanty v. Staudenraus, 321 Or. 532, 543, 901 P.2d 841 (1995). Intent is defined to mean "where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct." Id. at 550 (emphasis omitted). The nature of the relationship between the parties affects the type of conduct that is considered actionable. Id. at 548.

"Conduct that is merely rude, boorish, tyrannical, churlish and mean [is insufficient to be actionable, and] . . . insults, harsh or intimidating words, or rude behavior ordinarily [do not] result in liability even when intended to cause distress." Watte v. Edgar Maeyens, Jr., 112 Or. App. 234, 239, 828 P.2d 479, 481 (1992) (quoting Hall v. The May Dept. Stores, 292 Or. 131,

135, 637 P.2d 126, 129 (1984)).  In addition, Oregon cases which have allowed claims for

intentional infliction of emotional distress to proceed typically involve acts of psychological and

physical intimidation, racism, sexual harassment, or disability harassment.  See Babick v. Oregon

Arena Corp., 333 Or. 401, 413, 40 P.3d 1059 (2002) (defendant's release of intoxicated and

violent concertgoers who had been detained by plaintiffs presented a threat of imminent physical

harm that was presumed grave); Kraemer v. Harding, 159 Or. App. 90, 976 P.2d 1160 (1999)

(continued accusations that a school bus driver was a child sex abuser after multiple

investigations concluded that no inappropriate conduct occurred); Wheeler v. Marathon Printing,

Inc., 157 Or. App. 290, 974 P.2d 207 (1998) (co-worker continued harassment including sexual

remarks even after plaintiff attempted suicide); Lathrope-Olson v. Dept. of Transportation, 128

Or. App. 405, 408, 876 P.2d 345 (1994) (calling a Native American woman a squaw, telling her

that a squaw was supposed to walk behind her man, stating that all women were good for was

between their legs, locking her out of the work van in the rain and snow, and threatening to push

her into the path of oncoming vehicles); Mains v. II Morrow, Inc., 128 Or. App. 625, 877 P.2d 88

(1994) (supervisor's physical assaults, including touching plaintiff's breasts, shoving plaintiff,

grabbing plaintiff's ankles, blocking plaintiff's car, and encouraging other men to do the same,

and daily sexual comments); Franklin v. Portland Community College, 100 Or. App. 465, 787

P.2d 489 (1990) (supervisor called an African-American male by the name "boy," issued false

reprimands, shoved him, locked him in an office, and suggested that he apply elsewhere for

employment); Whelan v. Albertsons, 129 Or. App. 501, 505, 879 P.2d 888 (1994) (employee

believed to be gay was called a "queer" by a supervisor and another employee in the presence of

customers and other workers); Williams v. Tri-County Metropolitan Transportation Dist., 153

Page 17 - OPINION AND ORDER

Or. App. 686, 688, 958 P.2d 202 (1998) (bus driver loudly berated and belittled customer for attempting to board the bus with her assistance dog, commenting that customer did not appear disabled).

> "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.  Where reasonable [persons] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."

House v. Hicks, 218 Or. App. 348, 358, 179 P.3d 730 (2008) (quoting Restatement (Second) of Torts § 46 cmt. h (1965)).

This tort can be alleged if the employer committed abusive acts in the course of the firing or if the underlying acts preceding the firing were an extraordinary transgression of the bounds of socially tolerable conduct.  The mere act of firing an employee, without more, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior.  Madani v. Kendall Ford, Inc., 312 Or. 198, 204-05, 818 P.2d 930 (1991).

Defendants make several arguments but I will concentrate on whether they engaged in conduct that was extraordinarily beyond the bounds of socially tolerable behavior.  Isom's discrimination claims center on her allegation that she was either wrongly disciplined or disciplined for conduct engaged in by her white co-workers without being disciplined.  There is no evidence that Isom was subjected to long-standing severe race harassment of the kind laid out in the cases cited above.

I disagree with Isom that her situation is similar to that in two of the cases.  In Whelan, the plaintiff's supervisor and co-worker repeatedly referred to him in front of other employees as

Page 18 - OPINION AND ORDER

"queer," imitated his allegedly effeminate characteristics, and called him by the name of an effeminate movie character.  In front of a customer, the supervisor asked the plaintiff if he had "'fucked' a woman he dated, and then said 'you must not have, because a woman does not have what you want.'"  <u>Whelan</u>, 129 Or. App. at 503.  An angry outburst using this type of language was directed at the plaintiff in front of customers and employees.  <u>Id.</u> at 503-04.  The court held that the plaintiff stated a claim for the intentional infliction of emotional distress because of the repetition of the taunts in front of customers and co-workers.  <u>Id.</u> at 505-06.

In <u>Franklin</u>, the plaintiff alleged that his supervisor verbally and physically harassed him several times.  <u>Franklin</u>, 100 Or. App. at 470.  The court distinguished the harassing conduct from excessive supervision and unjustified reprimands, which do not amount to an extraordinary transgression of the bounds of socially tolerable conduct, and held that the plaintiff stated a claim for the intentional infliction of emotional distress.  <u>Id.</u> at 471-72.

Even if Isom was supervised more closely than her co-workers were and she was wrongly disciplined, she was not subjected to verbal or physical harassment.  I find that a reasonable jury could not conclude that defendants' conduct amounted to an extraordinary transgression of the bounds of socially tolerable conduct.  I grant summary judgment and dismiss the claim for the intentional infliction of emotional distress.

///

///

**CONCLUSION**

Defendants' Corrected Motion to Strike Inadmissible Evidence (#47) is granted in part.

Defendants' Motion for Summary Judgment (#16) is granted in part.

IT IS SO ORDERED.

Dated this _____20th_____ day of August, 2009.


                                    ____/s/ Garr M. King_____
                                    Garr M. King
                                    United States District Judge